<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

JOSH POMPEY,

          Petitioner,

          v.

WARDEN BRUCE DAVIS,

          Respondent.

Civil Action No. 23-00324 (BRM)

**OPINION**

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Petitioner Josh Pompey's ("Petitioner") petition for a writ of habeas corpus ("Petition") pursuant to 28 U.S.C. § 2254. (ECF No. 1.) Petitioner is a state prisoner confined at New Jersey State Prison in Trenton, New Jersey. Respondents filed a Motion to Dismiss ("Motion") the Petition as time barred. (ECF No. 7.) Petitioner filed a counseled response (ECF No. 10), and Respondents replied (ECF No. 12). Having considered the submissions of the parties without oral argument, for the reasons set forth below and for good cause shown, Respondents' Motion is **GRANTED** and the Petition is **DENIED**.

I.    **BACKGROUND**

In March 1998, Petitioner was convicted of the murder and sexual assault of his former girlfriend, Audrey Robinson, and the murder of her aunt, Madeline Mitchell. The Superior Court of New Jersey, Law Division summarized this matter's lengthy factual history as follows:

> **A. Scene of the Murder**
>
> On September 5, 1989, the bodies of Audrey Robinson and her aunt Madeline Mitchell were discovered in Ms. Robinson's Hackensack apartment. The medical examiner determined that the cause of death

for both victims was multiple stab wounds. When Audrey Robinson's body was discovered in her bedroom, she was wearing only a pair of socks with a belt tied around her neck and had 30 stab wounds to her head and neck. The fact that Ms. Robinson was discovered without any clothing led detectives to believe that there had been a sexual assault prior to her murder. Similarly, Ms. Mitchell's body was discovered in the living room and had a single stab wound below her left eye and 12 stab wounds to her chest. Medical examiners also discovered numerous contusions to both victims' faces which were consistent with being struck by closed fists.

Detectives from the Bergen County Prosecutor's Office and Hackensack Police Department conducted the crime scene investigation. The detectives found that a door leading from the basement to the kitchen had been shattered, and also noticed a basement window that appeared to be forcibly opened. Throughout the entire crime scene, detectives observed bloody hand prints that did not have any fingerprints leading them to conclude that the suspect wore gloves at the time of the murders. In addition, detectives found a bloody knife in Ms. Robinson's bedroom. The bedroom was in a state of disarray demonstrating that there had been a struggle. As with the bloody handprints, detectives found no fingerprints on the bloody knife.

As detectives searched Ms. Robinson's vehicle, which was parked in her driveway, they discovered that somebody had attempted to hot-wire it. In addition, the interior of the victim's vehicle contained a large amount of blood, which led detectives to believe that the suspect may have been injured by the knife used during the commission of the murders. Much like the inside of the victim's home, detectives found bloody hand prints on the vehicle but no fingerprints. Due to the similar nature of the hand impressions, detectives believed that the same person who left the bloody hand prints inside the victim's apartment, attempted to hot-wire the victim's vehicle to flee the scene of the murders.

## B. Investigation of Suspects

After ruling out two initial suspects, detectives went to the [Petitioner]'s residence at 227 Central Avenue in Hackensack to interview him on September 6, 1989. When they arrived, the [Petitioner]'s brother advised the detectives that he was not home. The detectives then contacted Larry Holmes, a professional boxer, with whom the [Petitioner] trained. Mr. Holmes told detectives that he hadn't seen the [Petitioner] in a few days, but was able to provide

them with a phone number where he could be reached. Later that evening, detectives returned to the [Petitioner]'s residence to speak with his mother. The detectives asked the [Petitioner]'s mother to have him contact the police when he arrived home.

The next day, September 1, 1989, Detective Michael Mordaga of the Hackensack Police Department observed the [Petitioner] walking along train tracks in Maywood. Detective Mordaga, who was off-duty at the time, turned his vehicle around and made eye contact with the [Petitioner]. Upon seeing Detective Mordaga, the [Petitioner] turned and walked away in the opposite direction and eventually ran through yards in an apparent attempt to evade police. Eventually, Detective Mordaga called the Maywood Police for backup and apprehended the [Petitioner]. While placing the [Petitioner] under arrest, Detective Mordaga observed cuts on the [Petitioner]'s knuckles and palms, which appeared to be knife wounds.

### C. [Petitioner]'s Statement

Once the [Petitioner] was transported to police headquarters, detectives provided him with a *Miranda* rights form which the [Petitioner] signed, indicating that he understood and voluntarily waived his rights. Initially, the [Petitioner] maintained that he had nothing to do with the murders and stated that he had been home all day on September 5, 1989. However, after further questioning, the [Petitioner] gave a detailed statement recounting the murders of Audrey Robinson and Madeline Mitchell and the disposal of key evidence.

Specifically, the [Petitioner] admitted that he went to the victim's home on September 5, 1989, and that he wore his mother's gloves because he did not want to leave any fingerprints. The [Petitioner] stated that he pried open a basement window to gain access to the victim's home to wait until she got home so he could talk her into rekindling their past relationship. At around 1:30 p.m. his ex-girlfriend, Ms. Robinson, pulled into the driveway and entered her first floor apartment. She left the apartment, but returned again around 3:30 p.m., and at that time discovered the [Petitioner] in her apartment.

The [Petitioner] told detectives that Ms. Robinson tried to get him to leave, but he pushed her toward her bedroom. After exchanging words with Ms. Robinson, the [Petitioner] stated that he began to choke her and asked her to have sexual intercourse. After rejecting his advances, the [Petitioner] claimed that Ms. Robinson eventually

got undressed due to his "persuasiveness" and he proceeded to have intercourse with her. The [Petitioner] claimed he became angry when he could not perform sexually due to Ms. Robinson's resistance. He then began to choke her again and a struggle ensued. During the struggle, the [Petitioner] stated that Ms. Robinson pulled the glove off of his right hand. Importantly, the [Petitioner] told officers that he wrapped a belt around Ms. Robinson's neck in an attempt to make her pass out and quiet her down.

Upon hearing the struggle, the victim's aunt, Ms. Mitchell, came downstairs. When she saw the [Petitioner], she attempted to run back to her upstairs apartment to call the police. The [Petitioner] ran after her and grabbed her leg as she was running up the stairs, dragging her back into Ms. Robinson's living room. At that time, the [Petitioner] punched Ms. Mitchell in the face repeatedly. After striking Ms. Mitchell, the [Petitioner] stated that he saw Ms. Robinson moving and ran to the kitchen to get a knife. The [Petitioner] then proceeded to stab Ms. Robinson repeatedly in the chest. The [Petitioner] specifically told officers that as he was stabbing Ms. Robinson, his hand slipped off of the knife handle, causing him to cut his hand. After stabbing Ms. Robinson numerous times, the [Petitioner] saw Ms. Mitchell attempting to stand up in the living room. According to the [Petitioner], he went to the kitchen and took a smaller knife which he used to stab Ms. Mitchell.

### D. Items Recovered After [Petitioner]'s Statement

During the [Petitioner]'s statement, he told detectives that after committing the murders, he left Ms. Robinson's apartment and attempted to hot-wire her vehicle which was parked in the driveway. When he was unable to start it, he fled the scene, walking along the railroad tracks so that nobody would see him covered in blood. The [Petitioner] stated that he took money from Ms. Robinson's purse before discarding it, along with the knife used to stab Ms. Mitchell, in a dumpster. Once the [Petitioner] returned home, he removed the bloody clothing and returned to the railroad tracks where he hid the clothing under old tires next to the tracks. After discarding the bloody clothes, the [Petitioner] returned home to wash the blood off of his sneakers.

When detectives received this information, they advised other officers to search for the discarded evidence at the locations described with great specificity by the [Petitioner], in the vicinity of Second Street in Hackensack. The detectives searched the dumpster that the [Petitioner] described, and discovered a white short-sleeve shirt which was covered in blood. The officers then proceeded to

search the area for the rest of the clothing that the [Petitioner] claimed to have discarded under old tires. After searching the area to no avail, the officers requested the assistance of a canine to locate the evidence. Approximately half an hour later, the canine located a brown plastic bag with yellow pull ties which contained a pair of dark pants, and a maroon jacket, both of which were also covered in blood. Notably, these items were discovered under old tires in a wooded area near the railroad tracks, exactly as the [Petitioner] had described to detectives during his statement. In addition, officers discovered a left-handed knit glove which was described as having cut marks and what appeared to be blood stains. When the glove was discovered, it was extremely damp and seemed to have been sitting in stagnant water.

After securing the items discovered in the dumpster and next to the railroad tracks, the officers secured and executed a search warrant at the [Petitioner]'s home. Upon searching the [Petitioner]'s home, officers discovered brown plastic garbage bags with yellow pull ties, matching the bag in which the bloody clothing was found. In addition, officers seized a pair of sneakers from the [Petitioner]'s home which subsequently tested positive for blood. Forensic analysis of the items retrieved from the dumpster and railroad tracks revealed transfer fibers, linking those articles of clothing to the victim's home and car.

### E. [Petitioner]'s Statements for Medical Treatment

After the [Petitioner]'s arrest, he was seen by the intake nurse at the Bergen County Jail, Margaret Neely, L.P.N. Upon examining the [Petitioner], Ms. Neely noticed cuts on his left hand. According to Ms. Neely's testimony, the cuts appeared to be 24 to 48 hours old. Ms. Neely's report indicated that the [Petitioner] stated that he cut his hand on a kitchen knife on September 5, 1989, the day of the victims' murders.

(ECF No. 7-23 at 156–61, PCR Court Op. 8/29/2017.)

On December 4, 1989, a Bergen County grand jury returned indictment number 89-12-01594-1, charging the defendant with two counts of knowing or purposeful murder contrary to N.J.S.A. 2C:11- 3(1) and (2); four counts of felony murder contrary to N.J.S.A. 2C:11-3a(3); one count of aggravated sexual assault contrary to N.J.S.A. 2C:14-2a(3); and one count of aggravated assault contrary to N.J.S.A. 2C:12-lb(5)(a). (*See id.* at 154.) Petitioner's initial trial, during which

the State sought the death penalty, resulted in a mistrial due to a deadlocked jury. (*Id.*) The State did not seek the death penalty on retrial, and Petitioner's retrial was scheduled before the Honorable William C. Meehan, J.S.C. (*Id.*) On March 9, 1990, following the retrial, Petitioner was found guilty on all counts of the indictment. (*Id.* at 154-155.) On April 3, 1998, the trial court sentenced Petitioner to an aggregate term of two life sentences plus 21 ½ years, with a 7-year and 9-month period of parole ineligibility. (*Id.* at 155.)

Petitioner filed a Notice of Appeal and on May 17, 2004, the Appellate Division affirmed Petitioner's conviction. (ECF No. 7-12 at 63–121.) On June 22, 2005, the New Jersey Supreme Court denied Petitioner's petition for certification. (ECF No. 7-7 at 66.) Petitioner did not file a petition for certiorari with the Supreme Court of the United States.

On January 4, 2006, Petitioner filed his first *pro so* Petition for Post-Conviction Relief ("PCR"). (*Id.* at 67–72.) On May 24, 2007, the State moved for summary dismissal of Petitioner's *pro se* PCR petition. (*Id.* at 73.) On August 14, 2007, Petitioner filed a counseled amended PCR petition, as well as a request for DNA testing. (ECF No. 7-9 at 23 to ECF No. 7-11 at 69.) On September 28, 2007, the PCR judge held a hearing and denied Petitioner's PCR petition on the record as time-barred but granted Petitioner's request for DNA testing. (ECF No. 7-32.) On October 18, 2017, the PCR court filed an Order memorializing the dismissal of Petitioner's PCR petition. (ECF No. 7-21 at 66–68.)

On December 18, 2007, Petitioner filed a Notice of Appeal from the PCR court's October 18, 2007 order dismissing the PCR petition as time-barred. (ECF No. 7-7 at 74.) On July 21, 2008, Petitioner sought to stay his appeal until conclusion of the DNA testing, or in the alternative to extend the deadline for filing his appellate brief. (*Id.* at 75–82.) The State did not oppose Petitioner's request, rather the State left the matter to the Appellate Divisions discretion. (*Id.* at

83.) On August 13, 2008, the New Jersey Superior Court, Appellate Division, dismissed Petitioner's appeal without prejudice, noting that Petitioner may file a new appeal at the completion of the DNA testing because "in that manner, all post-conviction proceedings [could] be considering one appeal." (*Id.* at 84.)

On September 9, 2011, Petitioner filed a motion seeking (i) a new trial based on newly discovered evidence; (ii) an evidentiary hearing; (iii) request for post-conviction discovery; or alternatively, to include these newly discovered facts and evidence with respect to existing PCR and/or as part of excluded record in future direct appeal. (ECF No. 7-21 at 144–79.) Petitioner sought a new trial, arguing that news articles related to one of the detectives involved in Petitioner's case alleged that the detective was associated with the mob. (*See id.*) On February 1, 2012, the PCR court denied Petitioner's motion for a new trial. The PCR court also found that if the motion was treated as a second PCR petition, that petition was dismissed as time barred. (ECF No. 7-21 at 192–200.)

On March 13, 2012, Petitioner motioned the Appellate Division to consolidate all issues related to the 2012 denial of his second PCR petition with his first 2007 PCR petition appeal. (ECF No. 7-7 at 85–91.) On April 9, 2012, the Appellate Division denied Petitioner's motion to consolidate issues and noted that there was nothing to consolidate, as Petitioner's first PCR appeal was dismissed in August 2008. (*Id.* at 92.) The DNA testing was completed in 2014. (ECF No. 7-22 at 114.)

On April 13, 2015, Petitioner filed a "successor" PCR petition, and a motion for a new trial and for additional DNA testing. (*Id.* at 43–88.) In addition to other arguments, Petitioner argued that new DNA evidence pertaining to the right-hand glove, shows the Petitioner is innocent and that his confession is false. (*See id.*) On August 29, 2017, following oral argument, the PCR court

denied Petitioner's third PCR petition and motion for a new trial. (ECF No. 7-23 at 154–77.)
Petitioner filed appeals from the 2007 and 2017 orders denying him PCR relief. On May 18, 2021,
the New Jersey Superior Court, Appellate Division, affirmed both the 2007 and 2017 denials of
Petitioner's PCR petitions. (ECF No. 7-1.) On January 28, 2022, the New Jersey Supreme Court
denied Petitioner's petition for certification. (ECF No. 7-30.)

On January 20, 2023, Petitioner filed his petition for writ of habeas corpus. (ECF No. 1.)
Petitioner raises to following claims:

1.   PETITIONER SHOULD BE GRANTED AN EVIDENTIARY HEARING
      BECAUSE NEWLY DISCOVERED EVIDENCE DERIVED FROM STATE-OF-
      THE-ART DNA TESTING PROVES THAT THE CONFESSION WAS FALSE
      AND ESTABLISHES A PRIMA FACIE CASE THAT PETITIONER'S
      CONVICTION WAS OBTAINED IN VIOLATION OF DUE PROCESS;

2.   THE DISTRICT COURT SHOULD GRANT ADDITIONAL DNA TESTING TO
      ALLOW PETITIONER TO ESTABLISH THIRD-PARTY GUILT;

3.   THE NEWLY DISCOVERED EVIDENCE RAISES PROOF THAT NAPUE
      VIOLATIONS INCLUDING MANUFACTURED OR FALSE EVIDENCE AND
      FALSE TESTIMONY OCCURRED AND THIS AFFECTED THE OUTCOME
      OF THE VERDICT;

4.   NEWLY DISCOVERED EVIDENCE IMPACTS PREVIOUS RULINGS AS TO
      THE SUPPRESSION OF THE BLOOD EVIDENCE, THE CONFESSION, AND
      THE BARRING OF THE FALSE CONFESSION EXPERT, THE PLANTED
      EVIDENCE EXPERT, THE FINGERPRINT EXPERT AND THE EDTA
      EXPERTS' TESTIMONY;

5.   THE TRIAL COURT EFFECTIVELY DENIED PETITIONER THE RIGHT TO
      A DEFENSE;

6.   THE TAMPERED WINDBREAKER LABEL EVIDENCE REQUIRES
      REVERSAL OF THE CONVICTIONS;

7.   PROSECUTORIAL MISCONDUCT IN THE FORM OF BRADY
      VIOLATIONS, FALSE TESTIMONY THAT REMAINS UNCORRECTED TO
      THIS DAY, AND INTENTIONAL TAMPERING AND DESTRUCTION OF
      EXCULPATORY PHYSICAL EVIDENCE DENIED PETITIONER THE RIGHT
      TO DUE PROCESS AND A FAIR TRIAL; and

8.      PETITIONER ASSERTS A FREE-STANDING ACTUAL INNOCENCE CLAIM (ECF No. 2 at 34–89.)

On February 17, 2023, Petitioner filed a brief in support of his habeas petition. (ECF No. 2.) Respondents subsequently filed the instant Motion to Dismiss, arguing that the petition is untimely under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). (ECF No. 7.) Petitioner filed a response, and Respondents filed a reply. (ECF Nos. 10, 11, 12.)

The matter is now ripe for decision without oral argument. Fed. R. Civ. P. 78(b).

## II.   STANDARD OF REVIEW

The AEDPA imposes a one-year period of limitation on a petitioner seeking to challenge his state conviction and sentence through a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. *See* 28 U.S.C. § 2244(d)(1). Under § 2244(d)(1), the limitation period runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1); *see also Jones v. Morton*, 195 F.3d 153, 157 (3d Cir. 1999). "[T]he statute of limitations set out in § 2244(d)(1) should be applied on a claim-by-claim basis." *Fielder v. Varner*, 379 F.3d 113, 118 (3d Cir. 2004).

Pursuant to § 2244(d), evaluation of the timeliness of a § 2254 petition requires a determination of, first, when the pertinent judgment became "final," and, second, the period of time during which an application for state post-conviction relief was "properly filed" and "pending." The judgment is determined to be final by the conclusion of direct review, or the expiration of time for seeking such review, including the ninety-day period for filing a petition for writ of certiorari in the United States Supreme Court. *See Gonzalez v. Thaler*, 132 S.Ct. 641, 653–54 (2012).

The AEDPA limitations period is tolled, however, during any period a properly filed PCR petition is pending in the state courts. 28 U.S.C. § 2244(d)(2); *see also Thompson v. Adm'r New Jersey State Prison*, 701 F. App'x 118, 121 (3d Cir. 2017); *Jenkins v. Superintendent of Laurel Highlands*, 705 F.3d 80, 85 (3d Cir. 2013). The PCR petition is considered to be pending, and the AEDPA limitations period continues to be tolled, during the time the petitioner could have appealed a PCR decision within the state courts, even if the petitioner did not in fact file such an appeal. *Carey v. Saffold*, 536 U.S. 214, 219–21 (2002); *Swartz v. Meyers*, 204 F.3d 417, 420–24 (3d Cir. 2000) (citing *Kapral v. United States*, 166 F.3d 565, 577 (3d Cir. 1999)). However, "[t]he application for state postconviction review is…not 'pending' after the state court's postconviction review is complete, and § 2244(d)(2) does not toll the 1-year limitations period during the pendency of a petition for certiorari." *Lawrence v. Florida*, 549 U.S. 327, 332 (2007).

## III.   DECISION

Respondents argue that the Petition is untimely. The Court agrees.

### A. Timeliness

Petitioner's conviction became final within the meaning of AEDPA on September 20, 2005, 90 days after the New Jersey Supreme Court denied certification of his direct appeal on June 22, 2005. (ECF No. 7-7 at 66); *see Jenkins v. Superintendent of Laurel Highlands*, 705 F.3d 80, 84 (3d Cir. 2013) ("[T]he expiration of the time for seeking direct review is the deadline for petitioning for certiorari to the United States Supreme Court.") Therefore, absent statutory tolling, Petitioner's AEDPA one-year time limitation expired on year later, on September 20, 2006.

### 1. Statutory Tolling

The AEDPA limitations period is tolled during the time a properly filed PCR petition is pending in the state courts. 28 U.S.C. § 2244(d)(2); *see also Thompson v. Adm'r New Jersey State Prison*, 701 F. App'x 118, 121 (3d Cir. 2017); *Jenkins*, 705 F.3d at 85. A properly filed application is one that the Court accepted for filing by the appropriate court officer and the Petitioner filed the application within the time limits prescribed by the relevant jurisdiction. *Pace v. DiGuglielmo*, 544 U.S. 408, 413 (2005). A properly filed PCR petition will continue to be "pending" in the state courts following an adverse determination by the PCR court until the time in which a petitioner has to file a timely direct appeal in the state courts has run. *See Swartz*, 204 F.3d could at 420-24, 423 n.6. Importantly, it is well established that a petition for state post-conviction relief that was rejected by the state courts as untimely is not deemed "properly filed" under § 2244(d)(2). *See Pace*, 544 U.S. at 414 ("When a postconviction relief petition is untimely under state law, that [is] the end of the matter for purposes of § 2244(d)(2).") (internal quotation marks and citation omitted); *see also Allen v. Siebert*, 552 U.S. 3 (2007).

As noted above, Petitioner's judgment of conviction became final on September 20, 2005. The following day on September 21, 2005, Petitioner's habeas statute of limitations began to run,

and it elapsed one year later, on September 21, 2006. *See* 28 U.S.C. § 2244(d)(1)(a). Petitioner

filed this habeas petition in January 2023, over sixteen years later.

The fact that Petitioner filed his first PCR petition on January 4, 2006, after the AEDPA

limitations period ran for only 104 days, does not induce statutory tolling of Petitioner's one-year

habeas deadline because Petitioner's first PCR was not "properly filed." (ECF No. 7-7 at 67–72.)

*See Pace*, 544 U.S. at 414; *see also Long v. Wilson*, 393 F.3d 390, 394–95 (3d Cir. 2004) ("The

state habeas petition had no effect on tolling, because an untimely state post-conviction petition is

not properly filed for the purposes of tolling."). Under New Jersey Court Rule 3:22-12, a petition

for PCR must be filed within five years of the date of entry of a judgment of conviction. *See e.g.*,

Pressler, Current N.J. Court Rules, cmt. 2 on N.J. Ct. R. 3:22-12 (2015) ("The five-year period . . .

commences when the judgment of conviction is entered and is neither stayed nor tolled by

appellate or other review proceedings."); *State v. Dillard*, 506 A.2d 848, 850 (N.J. Super. Ct. App.

Div.), *cert. denied*, 523 A.2d 169 (1986) (finding that "there is no provision for tolling in R. 3:22-

12 by reason of a direct appeal").

In Petitioner's case, the PCR court held that his first PCR petition was untimely because

more than five years elapsed between Petitioner's judgment of conviction on April 3, 1998, and

Petitioner's filing of his PCR on January 4, 2006. (*See* ECF No. 7-32.) Therefore, since Petitioner's

PCR was not "properly filed," he is not entitled to statutory tolling for the pendency of his PCR

proceedings.

Petitioner argues that although the PCR court dismissed his first PCR petition as untimely,

his properly filed motion for DNA testing triggered statutory tolling. (*See* ECF No. 10 at 16–20.)

Petitioner argues that the PCR judge's grant of Petitioner's motion for post-conviction DNA

testing remained pending until the New Jersey Supreme court denied certification on January 28, 2022, within one year of the filing of the habeas petition on January 20, 2023. (*Id.*)

The Third Circuit Court of Appeals has not resolved the issue of whether a post-conviction request for DNA testing in New Jersey constitutes a "properly filed application for . . . other collateral review" under Section 2244(d)(2). However, the majority of circuits to examine this issue have determined that post-conviction motions for discovery or DNA testing are not forms of collateral or post-conviction review. *See Woodward v. Cline*, 693 F.3d 1289, 1293 (10th Cir. 2012) (determining that a motion under Kansas statute permitting biological testing is not an application for collateral review that tolls AEDPA's statute of limitations); *Brown v. Sec'y for Dep't of Corr.*, 530 F.3d 1335, 1338 (11th Cir. 2008) (determining that Florida rule permitting post-conviction DNA testing did not toll AEDPA's limitations period because it did not provide a review mechanism); *Price v. Pierce*, 617 F.3d 947, 952–53 (7th Cir. 2010) (determining that Illinois statute permitting postconviction forensic testing was not a collateral review mechanism and did not toll AEDPA's limitations period); *Ramirez v. Yates*, 571 F.3d 993, 999–1000 (9th Cir. 2009) (determining that post-conviction discovery motions did not toll AEDPA limitations period because they did not challenge his conviction); *Hodge v. Greiner*, 269 F.3d 104, 107 (2d Cir. 2001) (determining that post-conviction motion for discovery under New York law did not challenge conviction and therefore did not toll AEDPA's limitations period).

However, this Court does not need to determine whether Petitioner's motion for DNA testing tolled the AEDPA statute of limitations. Even assuming, *arguendo*, that the AEDPA limitations period was tolled from January 4, 2006, the date of filing of Petitioner's first PCR petition and request for DNA testing, until January 28, 2022, the date the New Jersey Supreme Court denied Petitioner's petition for certification, the habeas petition is still untimely. As

explained above, the AEDPA limitations period ran for 104 days from September 21, 2005, the date Petitioner's habeas statute of limitations began to run, until January 4, 2006, the date he filed his first PCR petition and motion for DNA testing. Petitioner's habeas clock would have started to run again on January 28, 2022, the date the New Jersey Supreme Court denied Petitioner's petition for certification, with 261 days (365 – 104 = 261) days remaining on his habeas limitation period. As such, Petitioner had 261 days, or until October 17, 2022, to file a timely habeas Petition. The instant habeas petition was not filed until January 20, 2023, over three months after Petitioner's AEDPA limitations period had run. Therefore, even allowing for statutory tolling for the time in which Petitioner's DNA results were pending, his habeas petition is still untimely.

### 2. Alternate Habeas Limitations Start Date

While Petitioner does not argue that his "newly discovered" DNA evidence qualifies for an alternate start date under § 2244(d)(1), the Court will address the issue. The AEDPA gives a state prisoner one year to file a federal habeas petition, starting from "the date on which the judgment became final." 28 U.S.C. § 2244(d)(1)(A). But if the petition alleges newly discovered evidence, the filing deadline is one year from "the date on which the factual predicate of the claim . . . could have been discovered through . . . due diligence." § 2244(d)(1)(D).

By way of background, the New Jersey Superior Court, Appellate summarized the original DNA testing results from Petitioner's trial as follows:

> DNA testing established that [Petitioner] could not be ruled out as a major contributor, and the former girlfriend a minor contributor, to blood samples taken from inside her car and from his black pants. Additional items, found at the locations [Petitioner] identified, were also tested. The victim could not be ruled out as the major contributor and [Petitioner] the minor contributor, to blood found on his windbreaker and to blood stains found on a shirt in a dumpster. Additionally, [Petitioner] could not be ruled out as a contributor to the blood on the mattress and the victim's brassiere. Her boyfriend was excluded as a contributor to any samples.

(ECF No. 7-1 at 3.)

Petitioner argues the following pieces of DNA evidence are "new" and show his confession

was coerced and exonerate him.

1) DNA evidence from the right glove. Petitioner argues that the NJSP DNA lab identified DNA that was from the interior of the right brown glove [sample 57-3] and the lab called it an 'as worn' sample that had no blood on it." (ECF No. 2 at 20.) Petitioner submits that the DNA results from inside the right glove finger matches the victim's, Audrey Robinson, DNA profile and excluded Petitioner. (*Id.*, *see also* ECF No. 7-19 at 146.) Petitioner also submits that blood found on the right glove was a match to the victim's DNA profile, and no male DNA was found in the blood sample. (*Id.* at 22; *see also* ECF No. 7-16 at 147.)

2) DNA evidence from the left glove. Petitioner submits that the new DNA results indicate no DNA was found on the left glove. (*Id.*, *see also* ECF No. 7-16 at 147.)

3) DNA evidence from the belt. Petitioner submits that the new DNA results indicate that DNA found on the belt that was used to strangle the victim matched the DNA profile of the victim, but Petitioner's DNA was not found on the belt. (*Id.* at 25, *see also* ECF No. 7-16 at 149.)

4) DNA evidence from the brown plastic bag. Petitioner submits that the new DNA results from the brown plastic bag that Petitioner confessed to carrying his bloody clothes in indicated that no blood was found on the bag. (*Id.* at 26–27; *see also* ECF No. 7-16 at 149.)

5) DNA evidence from hair from the crime scene. Petitioner submits that the new DNA results from the hairs from the crime scene exclude Petitioner. (*Id.* at 26; *see also* ECF No. 7-16 at 149.)

6) DNA evidence from the rape kit evidence. Petitioner submits that the new DNA results excluded Petitioner from being a contributor from the rape kit evidence. (*Id.*; *see also* ECF No. 7-16 at 149.)

The Appellate Division also summarized Petitioner's claims in his first 2006 PCR petition

as follows:

> [Petitioner] filed his first PCR petition in January 2006, claiming that his experts were improperly barred from testifying as established by subsequent caselaw and news articles; the prosecutor engaged in misconduct during opening and closing statements; police tampered with evidence and conspired against him, as did the judges who presided over the case; the DNA evidence had been tampered with and was unreliable; he was wrongfully precluded from pursuing an investigation into the victim's boyfriend as a "bloody" fingerprint had been found on the utensil drawer (during the trial, the State's fingerprint expert said that although the boyfriend's fingerprint was found on the utensil drawer, it had no blood on it, and was not in a bloody area); the jury charge was erroneous; his confession was coerced and he should have been granted a *Miranda* rehearing after it was revealed that he had a handcuff on one arm when the stenographer transcribed his statement to police; the physical evidence against him should have been suppressed; the jury was prejudiced and engaged in misconduct; he was wrongfully precluded from trying on one of two knit gloves he allegedly wore during the killing; he was wrongly denied discovery essential to his attack on the credibility of the investigating officers who testified against him; the serology log books were doctored by police and prosecutors; the prosecutor presented perjured testimony regarding photos taken of the victim's car; defense witness testimony regarding his reaction to "learning" of the victim's death was wrongfully precluded; there was judicial bias against him; and appellate counsel failed to advise him of PCR filing deadlines and was otherwise ineffective. [Petitioner] also requested an evidentiary hearing and additional DNA testing.

(ECF No. 7-1 at 4–5.)

In order to determine the "factual predicate of the claim or claims presented" for purposes of section 2244(d)(1)(D), the Court must identify Petitioner's claims. Petitioner's brief in support of habeas relief is voluminous and many of his claims overlap. In addition to his request for an evidentiary hearing and additional DNA testing, Petitioner raises several due process claims, allegedly supported by "newly discovered evidence." Petitioner argues that he was denied due process and a fair trial because newly discovered DNA evidence shows Petitioner's confession was coerced, law enforcement manufactured false evidence, and prosecutorial misconduct in the form of introducing false testimony and the intentional tampering and destruction of exculpatory

physical evidence. Petitioner also argues that the newly discovered DNA evidence impacts the trial court's rulings as to the suppression of blood evidence, Petitioner's confession, and the preclusion of various experts. Petitioner's claims all boil down to his allegations that he was not the perpetrator, law enforcement coerced his confession, and law enforcement and the prosecution planted the evidence to match his coerced confession and/or tampered with the evidence. Petitioner argues that the "new" DNA results prove that he is innocent, and his confession was coerced.

The Third Circuit Court of Appeals considered what section 2241(d)(1)(A)'s term "factual predicate" means and explained "though the AEDPA does not define 'factual predicate,' we have held that '[s]ection 2244(d)(1)(D) provides a petitioner with the later accrual date than section 2244(d)(1)(A) only if *vital facts* could not have been known.'" *McAleese v. Brennan*, 483 F.3d 206, 214 (3d. Cir. 2007) (citation omitted). The Third Circuit found that the "factual predicate" of petitioner's claims constitutes the "vital facts" underlying those claims. *Id.*

Here, Petitioner confuses the facts that make up his claims, with "new" DNA evidence that support his claims. *McAleese*, 483 F.3d at 214, citing *Johnson v. McBride*, 381 F.3d 587, 589 (7th Cir. 2004) ("A desire to see more information in the hope that something will turn up differs from 'the factual predicate of [a] claim or claims' for purposes of § 2244(d)(1)(D).").

Any argument that the new DNA results from the left glove, the belt, the brown plastic bag, the hairs, or the rape kit presents a new factual predicate for Petitioner's claims fails, as it is merely additional support for a claim already raised by Petitioner. The PCR court explained in Petitioner's third PCR petition that these items are not new. (ECF No. 7-23 at 175–76.) In fact, the PCR court noted that "the defense strategy at trial was to highlight the lack of [Petitioner's] DNA found on the gloves, in the victim's car and at the crime scene in general," and defense counsel argued in his summation that the left glove lacked Petitioner's DNA. (*Id.* at 175.) Defense counsel

noted that Petitioner's hairs were not found on the glove or the knife. (ECF No. 14-4 at 91.) The fact that hairs tested post-conviction were not a match for Petitioner is not new evidence, rather just additional support for an argument already made to the jury regarding the lack of Petitioner's hairs at the scene. Defense counsel agued to the jury at trial that there was no blood in the plastic bag. (*Id.* at 122.) Therefore, the lack of Petitioner's DNA in the plastic bag is not new evidence. The jury was informed that DNA testing of the rape kit was not done because state laboratory had reported the absence of any seminal fluid. (ECF No. 14-2 at 81.) Finally, the lack of DNA on the belt is not "new evidence" that would be the factual predicate for a new claim, rather it is simply additional support for Petitioner's position that he is not the perpetrator and law enforcement tampered with evidence. The absence of Petitioner's DNA on these items is not new evidence and does not provide a new factual predicate for a different habeas limitations start date under section 2241(d)(1)(D).

The alleged "newly discovered" DNA evidence of the victim's DNA inside the finger of the right glove is merely cumulative evidence that Petitioner is attempting to use to corroborate his argument that his confession was coerced, and he is not the owner of and did not wear the gloves. Petitioner has claimed all along that he was not the owner of the gloves and that the police planted the gloves and coerced him to testify that he brought the gloves to the victim's house. (*See generally*, ECF No. 14-4.) The DNA testing results of the right glove from prior to trial indicated that the blood matched the DNA profile of the victim, and Petitioner was excluded as a contributor. (*See* ECF No. 14-2 at 66.) Therefore, the DNA evidence before trial already excluded Petitioner as a contributor and found that blood on the right glove matches the DNA profile of the victim. Additional DNA from the victim on the right glove is cumulative of the evidence before the jury

and merely supports for the claim petitioner was already making, *i.e.*, that he was not the owner of the gloves.

Petitioner now attempts to resurrect his time-barred habeas claims by alleging the fact that the victim's DNA was found on a different portion of the right glove is newly discovered evidence which is the factual predicate for his claim. Here, since his first PCR petition filed prior to the 2007, Petitioner set out the argument that his DNA was not on the gloves, which proved they were planted and his confession was coerced,  the "newly discovered" DNA evidence of the victim inside the glove is not a fact that Petitioner is using to support a new claim, rather is support for previous claim. At this juncture Petitioner would be precluded from resorting to § 2244(d)(1)(D) to reset the limitations clock.

### 3. Equitable Tolling

The one-year statute of limitations period under § 2244(d) is also subject to equitable tolling.

"Equitable tolling is proper only when the 'principles of equity would make [the] rigid application [of a time period] unfair.' Generally, this will occur when the petitioner has 'in some extraordinary way . . . been prevented from asserting his or her rights.' Moreover, to be entitled to equitable tolling, '[t]he petitioner must show that he or she 'exercised reasonable diligence in investigating and bringing [the] claims.' Mere excusable neglect is not sufficient." *Brown v. Shannon*, No. 01-1308, 2003 WL 1215520 at *4 (3d Cir. March 17, 2003) (citations omitted).

Equitable tolling may be appropriate where: "(1) the defendant has actively misled the plaintiff; (2) if the plaintiff has 'in some extraordinary way' been prevented from asserting his rights; or (3) if the plaintiff has timely asserted his rights mistakenly in the wrong forum." *Jones v. Morton*, 195 F.3d 153, 159 (3rd Cir.1999).

In the final analysis, federal review, on an equitable basis, of an untimely habeas petition is limited to the "rare situation where equitable tolling is demanded by sound legal principles as well as the interests of justice." *Id.*

Petitioner argues that he is entitled to equitable tolling because the DNA test results upon which his habeas petition is based were not previously available to him, and they show that the prosecution used a false confession to convict Petitioner. The Court notes that Petitioner argues "actual innocence" as one of his habeas claims.[1] To the extent Petitioner is arguing that the DNA results show Petitioner is actually innocent and that is a basis for equitable tolling, Petitioner has not met his burden of proof.

In *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013), the Supreme Court held that a credible claim of actual innocence may serve as an "equitable exception" that can overcome the bar of AEDPA's one-year limitations period. However, the *McQuiggin* Court cautioned that "tenable actual-innocence gateway pleas are rare," and a petitioner only meets the threshold requirement by "persuad[ing] the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* at 1928. An actual innocence claim must be based on "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence [] that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). In the Third Circuit, evidence is "new" for the purposes of the *Schlup* standard only if it was not available at the time of trial and could not have been

---

[1] To the extent that Petitioner argues actual innocence as an independent basis for habeas relief, free-standing claims of actual innocence are not reviewable in habeas actions. A claim of actual innocence is merely a gateway-the petitioner must allege at least one separate constitutional violation. *See Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.").

discovered earlier through the exercise of due diligence, except in situations where that evidence was not discovered due to the ineffective assistance of trial counsel. *See Houck v. Stickman*, 625 F.3d 88, 93–94 (3d Cir. 2010). In turn, when determining if a petitioner's new evidence shows it is "more likely than not that no reasonable juror would have convicted him," a court must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006). Finally, a court "may consider how the timing of the submission [of actual innocence] and the likely credibility of the affiant[] bear on the probable reliability of that evidence." *Schlup*, 513 U.S. at 332.

As explained above, Petitioner bases his claim of "actual innocence" on the absence of his DNA on both the right and left gloves, the brown plastic bag, the belt that was used to strangle the victim, the hairs found at the crime scene, and the rape kits. Additionally, Petitioner claims that the victim's DNA on the inside of the right gloves proves that he is innocent, and that law enforcement tampered with the evidence. Petitioner's argument fails for several reasons. First, as noted above, the lack of Petitioner's DNA on the gloves, the victim's DNA on the right glove, the lack of Petitioner's hairs at the scene, and the lack of blood on the plastic bag were presented to the jury at trial. The PCR court found on Petitioner's third PCR appeal "that the DNA test results of: (1) the gloves believed to be worn by the defendant, during the murder, (2) the brown plastic bag that the defendant's bloody clothing was discovered in; (3) the belt found around the victim's neck; and (4) swabs #81 and #82 from the victim's rape kit, all amount to cumulative, impeachment, and contradictory evidence and would not have had a probable impact on the jury's verdict." (ECF No. 7-23 at 175.) This is not "new reliable evidence" that was "not presented at trial." *Schlup*, 513 U.S. at 324.

Second, regarding the new DNA results that the victim's DNA was found inside the right glove, this evidence is cumulative of the evidence produced at trial. The DNA available prior to trial showed that the victim's DNA was found on the outside of the right glove. Additionally, as the PCR court noted "the DNA being discovered on the inside of the right glove is the only evidence that was not presented at the time of [Petitioner's] trial. However, this evidence is consistent with [Petitioner's] statement to detectives that the victim pulled his right glove off during the struggle, which the jury heard and considered before convicting [Petitioner]." (ECF No. 7-23 at 176.)

The PCR court explained that:

> The evidence at the [Petitioner's] trial included the [Petitioner's] own statement recounting the murders with specific details that were not disclosed to anyone prior to his statement. The [Petitioner's] statement included (1) how he entered the victim's apartment, (2) the rooms in which the bodies were found, (3) the areas of the victims' bodies that were stabbed, (4) the use of a belt tied around the victim's neck, (5) the fact that he attempted to hot-wire her car to flee the scene, (6) the route he took to avoid being seen covered in blood, and (7) the areas along the railroad tracks where he discarded key evidence. Virtually all of the [Petitioner's] statements were corroborated by the evidence collected by investigating officers.
>
> In addition, the following evidence was presented at trial: (1) the [Petitioner] had cuts on his palms and knuckles that corresponded with the cuts on the glove which was believed to be used during the murder, (2) the [Petitioner] made a statement to the nurse at the Bergen County Jail stating that he cut his hand on a kitchen knife on the same date as the murder, (3) there was blood discovered on the [Petitioner's] sneaker after officers executed the search warrant at his home, and (4) brown garbage bags with yellow tics that were seized from the [Petitioner's] home, which matched the brown bag that his bloody clothing was found in.

(ECF No. 7-23 at 173.)

Additionally, on appeal, the Appellate Division summarized the DNA evidence from Petitioner's trial that did place him at the crime scene as follows:

> DNA testing established that [Petitioner] could not be ruled out as a major contributor, and the former girlfriend a minor contributor, to blood samples taken from inside her car and from his black pants. Additional items, found at the locations [Petitioner] identified, were also tested. The victim could not be ruled out as the major contributor and [Petitioner] the minor contributor, to blood found on his windbreaker and to blood stains found on a shirt in a dumpster. Additionally, [Petitioner] could not be ruled out as a contributor to the blood on the mattress and the victim's brassiere. Her boyfriend was excluded as a contributor to any samples.

(ECF No. 7-1 at 3.)

The jury was informed that Petitioner's DNA was not found on the gloves and plastic bag and Petitioner's hairs were not found at the scene. The jury was also informed that the victim's DNA was found on the right glove. The jury was informed that DNA testing of the rape kit was not done because state laboratory had reported the absence of any seminal fluid. Additionally, the jury was informed that Petitioner's could not be ruled out as a major contributor to blood samples inside the victim's car and he could not be ruled out as a contributor to the blood on the mattress and the victim's bra. (ECF No. 7-1 at 3.) Finally, DNA testing showed the victim was a minor contributor to blood samples from Petitioner's black pants and a major contributor to blood samples from Petitioner's windbreaker and shirt. (*Id.*) "To qualify for [the actual innocence] exception, the petition must present new, reliable evidence showing it is more likely than not that no reasonable juror would have voted to convict him. *Reeves v. Fayette SCI*, 897 F.3d 154, 157 (3d Cir. 2018). Considering, Petitioner's reliance on DNA results that already existed at trial, the extensive DNA evidence at trial that placed Petitioner at the scene, and Petitioner's detailed confession, he cannot show that it is more likely than not that no reasonable juror would have convicted him if they had known about the victim's DNA being on the inside of the right glove.

Therefore, Petitioner's actual innocence argument does not qualify him for equitable tolling. Petitioner's petition for habeas relief is dismissed as time-barred.

## IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right.  Thus, no certificate of appealability shall issue.[2]

## V.   CONCLUSION

For the reasons set forth above, Respondents' Motion is **GRANTED**, Petitioner's petition for a writ of habeas corpus (ECF No. 1) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability.[3]  An appropriate order follows.

**Date:**  November 15, 2023

/s/Brian R. Martinotti
**HON. BRIAN R. MARTINOTTI**
UNITED STATES DISTRICT JUDGE

---

[2] We need not order an evidentiary hearing. Congress permits evidentiary hearings for section 2254 petitions "only in a limited number of circumstances." *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000). Petitioner must show, among other things, "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B). Petitioner does not make such a showing because his petition is time barred.

[3] Petitioner's request for additional DNA testing is denied as moot.